SUPREME COURT OF MISSOURI
 en banc
THOMAS HOOTSELLE, JR., et al., ) Opinion issued June 1, 2021
individually and on behalf of all others )
similarly situated, and MISSOURI )
CORRECTIONS OFFICERS )
ASSOCIATION, )
 )
 Respondents, )
v. ) No. SC98252
 )
MISSOURI DEPARTMENT OF )
CORRECTIONS, )
 )
 Appellant. )

 APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
 The Honorable Patricia S. Joyce, Judge

 The Missouri Department of Corrections (“MDOC”) appeals a judgment of the Cole

County circuit court awarding a class of Missouri corrections officers approximately

$113 million plus post-judgment interest for breach of contract. On appeal, MDOC claims,

among other things, that the circuit court erred in determining MDOC is liable on the

corrections officers’ breach of contract claims for time spent performing all preshift and

postshift activities. The corrections officers’ statement of undisputed material facts in support

of their motion for partial summary judgment demonstrated, as a matter of law, that the

retrieval of keys and radios and the supervision of inmates while walking to and from the

corrections officers’ daily posts are integral and indispensable to their work as correction
officers. Under the continuous workday rule, all preshift and postshift activities after the first

and before the last principal activity of either retrieving or returning keys and radios or

supervising inmates are also compensable. The undisputed material facts do not establish,

however, the chronological order of the preshift and postshift activities to permit a

determination of which preshift and post activities are compensable under the continuous

workday rule. Additionally, the undisputed facts are insufficient to show all the other preshift

and postshift activities are compensable as principal activities, as a matter of law, so the circuit

court’s determination that all preshift and postshift activities are compensable was erroneous.

The award of damages and the circuit court’s declaratory and injunctive relief were based on

that erroneous finding of liability, so those rulings are also erroneous.

 The portion of the circuit court’s judgment determining MDOC must compensate the

corrections officers for time spent retrieving keys and radios and time spent monitoring and

supervising offenders while not on post is affirmed. The remainder of the circuit court’s

judgment is vacated, and the cause is remanded.

 I. Factual and Procedural Background

 The plaintiffs are a class of corrections officers employed by MDOC 1 and the

corrections officers’ collective bargaining unit, the Missouri Corrections Officers Association

(“MOCOA”). The class covers approximately 14,000 officers employed within 21

correctional facilities. MDOC employs the corrections officers to supervise, guard, escort,

1
 The class is defined as all persons employed in positions as corrections officer I or
corrections officer II by MDOC at any time from August 14, 2007, to the present date for
claims relating to unpaid straight-time compensation and from August 14, 2010, to the present
date for unpaid overtime compensation.
 2
and discipline offenders incarcerated in Missouri prisons. Before arriving at their posts to

perform these duties, however, the corrections officers have long been required to perform a

variety of other tasks. These tasks are known within the MDOC as preshift activities.

 As part of their preshift activities, the officers log their arrival, scan identification, sign

entry and exit records or submit to biometric identification, pass through security, report to a

supervisor, retrieve equipment, walk to their posts, and exchange information with other

corrections officers. Corrections officers execute these same tasks in reverse upon leaving

their posts. When performed after leaving a post, these activities are referred to as postshift

activities. MDOC has never paid officers for time spent performing preshift and postshift

activities and has consistently denied requests for overtime pay for time spent completing

these activities.

 In 2007 and 2014, the corrections officers, through MOCOA, entered into labor

agreements with MDOC. The labor agreements govern a wide array of corrections officers’

rights and duties as MDOC employees and the agreements incorporated MDOC’s procedure

manual’s definitions and terminology. The manual defines how state compensatory time and

federal overtime are earned by corrections officers. Together, the agreement and the manual

provide that MDOC will comply with the Fair Labor Standards Act of 1938 (FLSA) regarding

the accrual and payment of overtime. The procedure manual also states its purpose is to

ensure departmental compliance with the FLSA and that the corrections officers must be

compensated for “time worked.”

 3
 In 2012, the corrections officers filed a class action lawsuit, 2 alleging MDOC breached

its statutory obligations under the FLSA and its contractual duties under the labor agreements

to pay the corrections officers for preshift and postshift activities. As amended, 3 the

corrections officers’ petition contains seven counts. Counts I and II asserted freestanding

claims for violations of section 105.935.3, RSMo Supp. 2005, and the FLSA, respectively.

Count III alleged MDOC breached a contract created by operation of section 105.935.3,

RSMo Supp. 2005, and 1 C.S.R. 20-5.010(1)(E) by failing to pay the corrections officers for

preshift and postshift activities. 4 Counts IV and V alleged claims for damages under unjust

enrichment and quantum meruit theories, respectively. In Count VI, MOCOA alleged MDOC

breached the 2007 and 2014 labor agreements by failing to pay the corrections officers for

preshift and postshift activities under the FLSA. In the alternative to Count VI, MOCOA

sought a declaration in Count VII that MDOC was contractually obligated to compensate the

corrections officers for preshift and postshift work time pursuant to the labor agreements.

2
 When the corrections officers filed their original petition in 2012, MOCOA was not a party.
It joined as a plaintiff when the corrections officers filed their second amended petition in
June 2017.
3
 The corrections officers filed an amended petition and a second amended petition, and then
amended the second amended petition by interlineation.
4
 1 C.S.R. 20-5.010(1)(E) provides:

 Employees . . . will be compensated at the regular rate of pay for their positions
 or, at the discretion of the appointing authority, by allowing an equal amount of
 compensatory time off for those work assignments which cause the employee
 to exceed forty (40) hours in pay status during a workweek. An employee shall
 receive an additional one-half (1/2) time compensation, by pay or compensatory
 time off, for any hours of work which exceed forty (40) hours actually worked
 within the workweek.
 4
 In 2014, MDOC filed a motion for judgment on the pleadings as to Counts I and II,

which the circuit court sustained. MDOC next moved for summary judgment in 2016,

claiming the corrections officers’ breach of contract claims should be treated the same as

freestanding claims for violations of the FLSA and dismissed. The motion was overruled.

 In June 2018, the corrections officers filed a motion for partial summary judgment on

their breach of contract claims, Counts III and VI of the petition. Essentially, the corrections

officers sought to have the circuit court determine MDOC was liable on its breach of contract

claims and leave the issue of damages to be decided by a jury. As authorized under Rule

74.04(c)(6), the circuit court sustained the corrections officers’ motion, entering a partial

summary judgment that determined MDOC was liable for all preshift and postshift activities

under the terms of the agreements requiring compliance with the FLSA. The circuit court

further held the only issue remaining for trial was a computation of the corrections officers’

damages. 5

 Before trial, the corrections officers filed a motion seeking to exclude the expert

testimony of MDOC’s experts, Dr. Chester Hanvey and Elizabeth Arnold, on grounds their

testimony did not meet the statutory requirements of section 490.065.2, RSMo Supp. 2018.

The circuit court sustained the corrections officers’ motion, and the case then proceeded to

trial in August 2018. During trial, the corrections officers presented the expert testimony of

Dr. William Rogers, who opined the corrections officers sustained actual damages of

approximately $113 million. MDOC again sought to introduce the rebuttal testimony of Dr.

5
 Although the issue of damages was the only issue remaining for trial by jury, Count VII
seeking declaratory and injunctive relief also remained pending.
 5
Hanvey and made an offer of proof outside the jury’s presence, but the circuit court ruled

MDOC’s expert testimony would remain excluded. The jury returned a verdict awarding the

corrections officers approximately $113 million.

 The circuit court entered a judgment in favor of the corrections officers on Counts III

and VI, the breach of contract claims. Counts IV and V were dismissed. The judgment also

adjudicated Count VII and declared the parties’ contractual rights and obligations under the

labor agreements. Among other things, the judgment declared the parties’ labor agreements

imposed a contractual duty on MDOC to pay compensation for all work performed by the

corrections officers as required by the FLSA, including preshift and postshift activities. The

circuit court further ordered MDOC to pay overtime compensation for preshift and postshift

activities prospectively and to implement a new department-wide timekeeping system to track

time spent performing preshift and postshift activities. MDOC appealed, and this Court

granted transfer after an opinion by the court of appeals. Mo. Const. art. V, sec. 10.

 II. Analysis

 MDOC raises several issues on appeal, including claims that the circuit court erred in:

sustaining the corrections officers’ motion for partial summary judgment because preshift and

postshift activities are not compensable under the FLSA; sustaining the corrections officers’

motion for partial summary judgment because they cannot maintain a private cause of action;

excluding MDOC’s expert witnesses; overruling MDOC’s motion to decertify the class; and

granting the corrections officers declaratory and injunctive relief on an expired contract.

 6
 A. Corrections Officers Can Maintain Private Cause of Action

 Whether the corrections officers may maintain a private cause of action to enforce

contractual terms that incorporate the FLSA is a threshold issue. MDOC claims the circuit

court erred in sustaining the corrections officers’ motion for partial summary judgment

because the corrections officers’ breach of contract claims are indirect attempts to enforce the

FLSA and a private cause of action cannot be maintained to enforce MDOC’s statutory

obligations. The corrections officers respond that MDOC is raising this issue for the first time

on appeal and, even had MDOC raised the issue in the circuit court, it is not preserved because

MDOC did not include it in its motion for new trial. On the merits, the corrections officers

state they seek only to enforce the labor agreements between the corrections officers and

MDOC, which provided MDOC would pay for “time worked” and overtime for hours

“physically worked.” Therefore, the corrections officers claim the causes of action they are

maintaining are not freestanding causes of action under the FLSA but rather state law contract

claims.

 The Court considers first whether MDOC properly preserved this issue for appeal. In

its memorandum of law filed in opposition to the corrections officers’ motion, MDOC argued

the corrections officers could not maintain a private cause of action under the FLSA. On

appeal, it reasserts this claim and asserts it was not required to raise the issue again in its

motion for new trial. It is true that, to preserve claims of error for appellate review in cases

tried by a jury, claims of error must be raised in post-trial motions. Vance Bros., Inc., v.

Obermiller Constr. Servs., Inc., 181 S.W.3d 562, 564 n.3 (Mo. banc 2006); Rule 78.07(a). In

a case tried without a jury, however, no motion for new trial is necessary to preserve an issue

 7
for appellate review if it “was previously presented to the trial court.” Rule 78.07(b). Issues

determined under Rule 74.04 are considered tried without a jury. See Taylor v. United Parcel

Serv., Inc., 854 S.W.2d 390, 393 (Mo. banc 1993). Therefore, Rule 78.07(b) applies, and

MDOC preserved this issue for appeal by raising it in opposition to the corrections officers’

motion for partial summary judgment.

 MDOC’s claim that the corrections officers cannot maintain their breach of contract

action relies on two fundamental propositions. First, MDOC states the corrections officers

cannot maintain a cause of action against the state, or its agencies, directly under the FLSA.

Although the FLSA purports to subject states to suit in state courts without their consent, see

29 U.S.C. sections 203(x), 216(b), this private cause of action was held constitutionally

invalid as applied to states that have not consented to suit, Alden v. Maine, 527 U.S. 706, 760

(1999). Claims arising directly under the FLSA may be brought against a state agency only

if the state has waived sovereign immunity and consented to suit. Id. at 757.

 Second, recognizing that the corrections officers are not purporting to bring an action

under the FLSA but rather a common law breach of contract claim, MDOC suggests the

breach of contract claim should be treated as though it is merely a disguised attempt to enforce

the FLSA. Otherwise, MDOC asserts, permitting the corrections officers to maintain a breach

of contract claim would circumvent the FLSA’s lack of a private cause of action.

 In support, MDOC cites Astra USA, Inc. v. Santa Clara County, California, 563 U.S.

110 (2011), and Grochowski v. Phoenix Construction, 318 F.3d 80, 86 (2d Cir. 2003). Unlike

the FLSA, the statutes at issue in those cases did not purport to provide a private cause of

action. Astra, 563 U.S. at 117; Grochowski, 318 F.3d at 85. To give effect to the legislatures’

 8
decisions not to provide a private cause of action in those statutes, the courts declined to let a

party bring a state law breach of contract action that merely attempted to enforce statutory

obligations. Astra, 563 U.S. at 118; Grochowski, 318 F.3d at 86. By contrast, the FLSA

purports to provide for a private cause of action against states and their agencies. There is no

danger here of nullifying a legislative decision not to grant a private cause of action.

Therefore, Astra and Grochowski are distinguishable on their most essential facts. The

concern becomes not one of transgressing a legislative scheme but one of sovereign immunity

and consent to suit.

 MDOC cites Nuñez v. Indiana Department of Child Services, 817 F.3d 1042 (7th Cir.

2016), to support the proposition that courts should not find a state consented to suit for FLSA

violations by entering into an employment contract that incorporates FLSA obligations. In

Nuñez, investigators employed by the Indiana department of child services sought to sue the

department in federal court for violations of the FLSA. Id. at 1043. The investigators claimed

Indiana had consented to federal FLSA suits by its employees because “(1) Indiana allows

suits to be brought against the state for violations of express and implied contracts, (2) an

employment relationship is a contract for purposes of Indiana law, and (3) the FLSA’s

requirements are embedded in all employment relationships and thus in contracts.” Id. at

1045. The Seventh Circuit declined to find that Indiana had impliedly consented to

freestanding suits for FLSA violations on the basis that it consented to suit for breach of

contract. Id.

 Unlike the plaintiffs in Nuñez, the corrections officers do not claim the state has waived

sovereign immunity for claims arising under the FLSA. Their counts alleging causes of action

 9
under the FLSA have been dismissed. The corrections officers and MDOC negotiated labor

agreements that expressly incorporated MDOC’s FLSA obligations. The corrections officers

are suing for breach of those labor agreements. They are alleging state-law breach of contract

claims, not freestanding claims for violations of the FLSA as the Nuñez plaintiffs sought to

do.

 Breach of contract claims may be maintained against the state to enforce an express

contract even when that contract incorporates statutory obligations. Dierkes v. Blue Cross &

Blue Shield of Mo., 991 S.W.2d 662, 668 (Mo. banc 1999). The state waives sovereign

immunity when it enters into an express contract. Kubley v. Brooks, 141 S.W.3d 21, 28 (Mo.

banc 2004). Therefore, the corrections officers’ breach of contract counts seeking to enforce

against the state an express contract with terms that incorporate FLSA obligations do not

circumvent the FLSA and do not implicate the state’s sovereign immunity. The corrections

officers can maintain claims against the state for breach of an express contract even though

the contract incorporates obligations imposed by the FLSA.

 B. No Error in Refusal to Decertify Class

 The circuit court certified this class of plaintiffs in September 2015. In February 2018,

MDOC filed a motion for class decertification that alleged the class failed to meet the

predominance and superiority requirements of Rule 52.08(b)(3). The circuit court overruled

the motion, finding common issues predominated and a class action was still a superior

method of fair and efficient adjudication.

 MDOC filed a motion to reconsider class decertification in June 2018 and renewed its

motion for decertification twice during trial. The circuit court overruled the motions as they

 10
presented the same arguments it considered in MDOC’s first motion to decertify the class.

On appeal, MDOC again claims the circuit court erred in refusing to decertify the class

because the class failed to meet the predominance and superiority requirements of Rule

52.08(b)(3).

 Standard of Review

 Whether a claim should proceed as a class action “rests with the sound discretion of

the trial court.” State ex rel. Gen. Credit Acceptance Co., LLC v. Vincent, 570 S.W.3d 42, 46

(Mo. banc 2019). A circuit court abuses its discretion if its decision “is clearly against the

logic of the circumstance, is arbitrary and unreasonable, and indicates a lack of careful

consideration.” State ex rel. McKeage v. Cordonnier, 357 S.W.3d 597, 599 (Mo. banc 2012).

 Discussion

 Class certification is governed by Rule 52.08. In addition to the numerosity,

commonality, typicality, and adequacy requirements of Rule 52.08(a), plaintiffs seeking class

certification must also satisfy one of the three requirements of Rule 52.08(b). Green v. Fred

Weber, Inc., 254 S.W.3d 874, 877 (Mo. banc 2008). In the case at hand, the corrections

officers were certified as a class under Rule 52.08(b)(3), which requires that common

questions of law or fact “predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy.”

 MDOC alleges the class fails to meet Rule 52.08(b)(3)’s predominance and superiority

requirements because individual questions of class members’ damages predominate over

common questions of liability. It presented deposition testimony to show individual class

 11
members spent varying amounts of time performing the activities for which they seek

compensation. The time spent performing the activities varies among each of the 21 facilities

that employ the corrections officers and among corrections officers within each individual

facility. MDOC contends the method of common proof, i.e., electronic entry and exit logs,

used to compute the time spent on these activities, was unreliable and tracked only time spent

within the security envelope, not time spent working. It argues the testimony showed

corrections officers often log entry into a facility and then work out, socialize, or attend to

other personal matters before beginning their preshift activities. MDOC also asserts its

affirmative defenses – offset of damages, laches, judicial estoppel, and statute of limitations

– do not apply to all class members. Instead, their application turns on individual questions

of fact. MDOC claims these individual questions regarding damages overwhelmed the

common questions of liability.

 The need for inquiry as to individual damages, however, “does not preclude a finding

of predominance.” State ex rel. Am. Family Mut. Ins. Co. v. Clark, 106 S.W.3d 483, 488 (Mo.

banc 2003). Predominance “does not demand that every single issue in the case be common

to all the class members, but only that there are substantial common issues which

‘predominate’ over the individual issues.” Id. The predominate issues “need not be

dispositive of the controversy or even be determinative of the liability issues involved.” Id.

(quotations omitted). Common questions of law or fact may be overriding, “despite the fact

that the suit also entails numerous individual questions.” Id.

 In its order overruling MDOC’s motion for class decertification, the circuit court

expressly found:

 12
 common issues predominate in this litigation, including . . . whether the
 contract requires Defendants to comply with the FLSA’s overtime
 requirements; whether the pre- and post-shift activities performed by Plaintiffs
 are compensable under the FLSA and the contract; . . . whether Defendants’
 refusal to compensate Plaintiffs for pre- and post-shift activities is a breach of
 its contract with Plaintiffs . . . . Moreover, these common issues will be decided
 using common evidence. Plaintiffs and the Class performed virtually identical
 pre- and post-shift activities across different Department of Corrections
 facilities over the time period of the class, and their employment by [MDOC] is
 governed by the same Labor Agreement and Procedures Manual.

In light of these numerous common questions of law and fact, the circuit court did not abuse

its discretion in overruling MDOC’s motion for class decertification.

 Relying on the same individual questions of damages, MDOC also claimed class

adjudication would be unfair and, therefore, it was not the superior method of adjudication.

Yet “[t]he primary focus of the superiority analysis is the efficiency of the class action over

other available methods of adjudication.” Dale v. DaimlerChrysler Corp., 204 S.W.3d 151,

182 (Mo. App. 2006). The analysis permits consideration of the “improbability that large

numbers of class members would possess the initiative to litigate individually.” Id.

 The circuit court’s order overruling the motion to decertify the class found the

superiority requirement was met because decertification would create the need for thousands

of mini-trials that would decide identical issues. The circuit court’s decision is not clearly

against the logic of the circumstances, nor is it arbitrary or unreasonable. The circuit court

did not abuse its discretion in overruling MDOC’s motion to decertify the class.

 C. Undisputed Facts Insufficient to Support Entirety of Partial Summary Judgment

 MDOC next contends the circuit court erred in sustaining the corrections officers’

motion for partial summary judgment on the breach of contract counts because none of the

preshift and postshift activities are integral and indispensable to the work the corrections
 13
officers are employed to perform; therefore, MDOC had no duty to compensate the

corrections officers for time spent performing the activities under the terms of the contract

requiring compliance with the FLSA. The corrections officers claim they presented

undisputed material facts showing, as a matter of law, their preshift and postshift activities

are compensable under the FLSA; therefore, the circuit court did not err in granting partial

summary judgment in their favor on the issue of liability for breach of contract.

 Standard of Review

 The circuit court’s authority to sustain the corrections officers’ motion for partial

summary judgment derives from Rule 74.04(c)(6), which provides, “A summary judgment,

interlocutory in character, may be entered on any issue, including the issue of liability alone,

although there is a genuine issue as to the amount of damages.” Whether the undisputed facts

render MDOC liable for the corrections officers’ breach of contract claims is a question of

law that is reviewed de novo. ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp., 854

S.W.2d 371, 376 (Mo. banc 1993). The record must be reviewed in the light most favorable

to MDOC, as the non-movant. Id. As the non-movant, MDOC is given the benefit of all

reasonable inferences, so if the corrections officers require an inference to establish their right

to a determination that MDOC is liable on their breach of contract claims, and the evidence

reasonably supports any inference other than (or in addition to) the corrections officers’

inference, a genuine dispute exists and their prima facie showing fails. Id. at 382.

 To establish there is no genuine dispute as to material facts demonstrating MDOC is

liable on the corrections officers’ breach of contract claims, Rule 74.04(c)(1) required the

corrections officers to “attach to the motion for summary judgment a statement of

 14
uncontroverted material facts.” Green v. Fotoohighiam, 606 S.W.3d 113, 116 (Mo. banc

2020). The statement of uncontroverted material facts had to state “with particularity in

separately numbered paragraphs each material fact as to which movant claims there is no

genuine issue, with specific references to the pleadings, discovery, exhibits or affidavits that

demonstrate the lack of a genuine issue as to such facts.” Id. (quoting Rule 74.04(c)(1)).

 Many of the corrections officers’ separately numbered paragraphs fail to comply with

Rule 74.04(c)(1) because they do not purport to state material facts. Rather, many state only

that a fact witness has testified about a fact in his or her deposition. But unless the mere

existence of that deposition testimony is, in and of itself, a material fact, an admission of the

correctness of the statement of the witness’s testimony does not prove the substance of the

witness’s testimony is undisputed. Custer v. Wal-Mart Stores, E. I, LP, 492 S.W.3d 212,

215 (Mo. App. 2016).

 Paragraph 74 is an example of how the corrections officers have confused the existence

of deposition testimony with the substance of that testimony. It states: “Warden Sachse

testified that Class Plaintiffs are ‘expected to handle incidents that rise to the level of needing

intervention’ while walking from the airlock to their posts. Ex. 11, Sachse Dep. at 41:15-25.”

That alleged statement of material fact does not assert class plaintiffs are expected to handle

incidents that rise to the level of needing intervention while walking from the airlock to their

posts. Although MDOC admitted the truth of Paragraph 74, an admission of that paragraph

admits only that Warden Sachse said what she said; it does not admit corrections officers are

expected to handle incidents that rise to the level of needing intervention while walking from

the airlock to their posts. See Custer, 492 S.W.3d at 215-16.

 15
 The result of the corrections officers presenting the mere existence of deposition

testimony as material fact was to require MDOC to engage “in the meaningless activity of

admitting or denying whether [the corrections officers] accurately quoted deposition

testimony” when responding to the statement of uncontroverted material facts. See id. Stating

deposition testimony as a material fact does not aid a court in identifying material facts or

determining the existence of any genuine issue. Id. Consequently, MDOC’s admissions of

the paragraphs that merely state a witness testified about a fact in his or her deposition will

not be considered in reviewing whether the corrections officers met their burden under

Rule 74.04.

 Discussion

 The FLSA requires employers to pay their employees a minimum wage and establishes

overtime pay for each hour worked in excess of 40 hours in a workweek. The FLSA does

not, however, define “work” or “workweek.” Consequently, the Supreme Court of the United

States supplied the scope and meaning of the terms and, relying on the statute’s remedial

purpose, arrived at a broad construction of “work” encompassing physical or mental exertion

“controlled or required by the employer and pursued necessarily and primarily for the benefit

of the employer.” IBP, Inc. v. Alvarez, 546 U.S. 21, 25 (2005). The Supreme Court also

reached a similarly broad construction of “workweek” to include “all time during which an

employee is necessarily required to be on the employer’s premises, on duty or at a prescribed

workplace.” Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 690-91 (1946).

 Under its broad definitions, the Supreme Court found nearly every activity undertaken

for the benefit of the employer qualified as compensable work, including time spent traveling

 16
to and from the location of work, putting on necessary clothing and equipment, and preparing

machinery. See Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 599

(1944); Anderson, 328 U.S. at 691-93. In response, Congress found the Supreme Court’s

interpretation of the FLSA created “unexpected liabilities,” 29 U.S.C. section 251(a), and

passed the Portal-to-Portal Act to exempt employers from liability under the FLSA for failing

to pay overtime for two categories of work. Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27,

32 (2014). Under the Portal-to-Portal Act, employers are not liable for failing to pay overtime

compensation for “(1) walking, riding, or traveling to and from actual place of performance

of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities.”

29 U.S.C. section 254(a).

 An employee’s principal activities are (1) those the employee is employed to perform

and (2) those both integral and indispensable to the performance of the work the employee is

employed to perform. Busk, 574 U.S. at 33. An activity is integral to the work the employee

is employed to perform if it is an intrinsic element of the work. Id. It is indispensable if the

employee cannot dispense with the activity if he or she is to perform the work. Id. Any

activity both integral and indispensable to the work an employee is employed to perform is,

itself, a principal activity. Id. In addition, under the continuous workday rule of the Portal-

to-Portal Act, all activities performed after an employee begins the first principal activity of

a shift and before the employee completes the last principal activity of a shift are compensable,

regardless of whether some of the intervening activities, standing alone, would not be

compensable as principal activities. IBP, 546 U.S. at 28; 29 U.S.C. section 254(a); 29 C.F.R.

 17
790.6. If any one of the preshift activities is compensable, all subsequent preshift activities

are also compensable. 29 U.S.C. section 254(a). Similarly, if any single postshift activity is

compensable, all preceding postshift activities are compensable. Id.

 This rule makes the chronology of activities crucial to the application of the “integral

and indispensable” test. For preshift activities, each activity must be evaluated in

chronological order until an activity, standing alone, is compensable as a matter of law. Any

activities occurring before the first compensable activity need not be compensated, but all

activities after the first compensable activity must be compensated. Likewise, for postshift

activities, each activity must be evaluated in reverse chronological order until an activity,

standing alone, is compensable as a matter of law. Any activities occurring after the last

compensable activity need not be compensated, but all activities before the last compensable

activity must be compensated.

 There is no dispute the work the corrections officers are employed to perform consists

of: supervising the movement of offenders; conducting periodic counts of offenders;

searching offenders and their living quarters for contraband; supervising offenders; escorting

and transporting offenders; or disciplining offenders. Whether the preshift and postshift

activities qualify as compensable principal activities depends on whether they are integral and

indispensable to the work the corrections officers are employed to do. Although the inquiry

is necessarily fact-intensive, Llorca v. Sheriff, Collier Cnty., Fl., 893 F.3d 1319, 1324 (11th

Cir. 2018), whether an activity is integral and indispensable to the work the corrections

officers are employed to do is a question of law, Barrentine v. Ark.-Best Freight Sys., Inc.,

450 U.S. 728, 738 n.13 (1981).

 18
 MDOC claims the circuit court’s determination that MDOC was liable on the

corrections officers’ breach of contract claims was erroneous because the preshift and

postshift activities do not qualify as principal activities. Rather, MDOC claims, they

constitute an ordinary process of ingress and egress, and it offers an activity-by-activity

analysis of whether any one of the preshift and postshift activities qualifies as indispensable

and integral to the work the corrections officers are employed to do – supervise, guard, escort,

and discipline offenders.

 The Rule 74.04 record shows that, for their preshift and postshift activities, the

corrections officers:

 • log arrival and departure through signing a paper record, scanning identification,
 or submitting to biometric identification;
 • report to a central observation post to receive assignments, if needed;
 • undergo a security screening and pass through security gates, some of which
 include metal detectors, except for tower officers;
 • pass through an airlock, if the facility is equipped with one;
 • report to a custody supervisor to receive daily post and duty assignments, if needed;
 • retrieve and return keys and radios from electronic key boxes or “issue rooms,” if
 needed;
 • walk to and from their daily posts;
 • complete a patrol vehicle inventory, if a patrol car officer; and
 • receive or pass on information from one shift to the next.

These activities all occur within the prison and are required of more than 90 percent of

corrections officers. 6

 In relation to the activities as a whole, the corrections officers contend they are

indispensable and integral to the corrections officers’ work, citing two facts. First, they cite

the fact MDOC’s former deputy division director, Dwayne Kempker, testified:

6
 Tower officers and patrol car officers do not go through security.
 19
 [The preshift and postshift activities] create for us a safe and secure facility
 where we properly identified [sic] staff and we properly equip them. We made
 sure contraband wasn’t introduced in the facility which I guess by extension
 helps for safety and security.

 It’s necessary to operate and maintain a safe facility, and you can only do so by
 knowing the identity of the people within to making [sic] sure unauthorized
 items aren’t carried in and that people are properly equipped to protect
 themselves.

 [T]hese are all done . . . relative to a level of security we can stand. Could we
 function for a little while without doing any of them? Sure, but safety and
 security is going to be compromised in a very traumatic way. So we like to think
 they’re essential.

 We like to think we have standards about safety and security, and to insure [sic]
 those then we need to – doing these things are essential to protecting that safety
 and security.

Second, they rely on the fact Mr. Kempker testified the activities “are necessary and essential

to keep and house criminals” and “are required because of the nature of the job that the guards

are doing.” As previously discussed, the corrections officers merely state a fact witness said

what he said. By MDOC’s admission, it admits only that Mr. Kempker so testified. Because

the substance of Mr. Kempker’s testimony has not been stated as a material fact or shown to

be undisputed, it cannot be considered in determining whether MDOC is liable, as a matter of

law, on the corrections officers’ breach of contract claims.

 The only other facts in the Rule 74.04 record relating to the activities as a whole are

that the activities are “important to the end of housing dangerous criminals” and “connected

to keeping criminals safely locked behind bars.” These two facts do not establish all preshift

and postshift activities are either integral or indispensable to the work. Because no other facts

 20
relate to the activities as a whole, the activities will be considered separately7 to determine

whether the facts relating to specific activities demonstrate any activity, standing alone, is

compensable. An activity qualifies as a principal activity if it is either: (1) the work the

corrections officers are employed to do or (2) both integral and indispensable to that work.

 1. Logging Arrival and Departure

 MDOC asserts logging arrival and departure is not compensable because it is precisely

the sort of activity the Portal-to-Portal Act provides is merely preliminary to the work and not

compensable. It cites two cases holding a check-in process of one kind or another was not

compensable, Gorman v. Consolidated Edison Corp., 488 F.3d 586, 592 (2d Cir. 2007), and

Haight v. Wackenhut Corp., 692 F. Supp. 2d 339, 344 (S.D.N.Y. 2010). 8 Notably, however,

neither of these cases involves corrections officers. Because an activity’s compensability

depends on whether it is integral and indispensable to the work an employee is hired to do, an

activity may be compensable in relation to one job but not compensable in relation to another.

The corrections officers offer no argument specific to logging arrival and departure.

 Logging arrival and departure is not the work the corrections officers are employed to

do – supervising, guarding, escorting, or disciplining offenders – so it is compensable only if

it is integral and indispensable to that work. The generally applicable facts that all activities

7
 As discussed below, the undisputed material facts are insufficient to show the exact
chronological order in which preshift and postshift activities are done. For that reason, this
opinion analyzes the activities in the order they are listed in the corrections officers’ statement
of uncontroverted material facts.
8
 It also cited a third case, Mertz v. Wisconsin Department of Workforce Development, 365
Wis.2d 607 (Wis. App. Oct. 22, 2015), but this decision is unpublished. It has no precedential
authority in its own jurisdiction, much less in this state. In re Desmond F. v. Brenda B., 795
N.W.2d 730, 741 n.11 (Wis. 2011) (“An unpublished opinion has no precedential value and
is not binding on any court of this state.”).
 21
are “important to the end of housing dangerous criminals” and “connected to keeping

criminals safely locked behind bars” do not suffice to show logging arrival and departure is

integral or indispensable to the work. “The fact that certain preshift activities are necessary

for employees to engage in their principal activities does not mean that those preshift activities

are ‘integral and indispensable’ to a ‘principal activity’ under Steiner.” IBP, 546 U.S. at 40;

see also Busk, 574 U.S. at 36 (“If the test could be satisfied merely by the fact that an employer

required an activity, it would sweep into “principal activity” the very activities that the

Portal-to-Portal Act was designed to address.”).

 Because there are no undisputed material facts showing that logging arrival and

departure is an intrinsic element of supervising, guarding, escorting, or disciplining offenders,

the corrections officers failed, as a matter of law, to carry their burden under Rule 74.04.

 2. Security Screenings

 When entering the facility, all corrections officers must “go through some manner of

search.” For more than 90 percent of the officers, that means undergoing a security screening

that involves passing through security gates, metal detectors, or airlocks. MDOC articulates

two reasons this activity is not compensable and the circuit court erred in holding otherwise.

First, it claims the purpose of the security screenings is to keep employees safe by preventing

weapons and dangerous items from entering the facility. This assertion is not supported by

facts in the Rule 74.04 record. Second, it claims everyone entering the facility, employees

and visitors alike, must submit to the security screenings, precluding finding the activity is

integral to the corrections officers’ work. The Rule 74.04 record, however, does not show

everyone entering the facility must submit to a security screening. No statement of fact,

 22
whether compliant with Rule 74.04(c)(1) or not, says visitors must submit to security

screenings.

 The corrections officers contend the security screenings are compensable because they

are tied to the corrections officers’ work of supervising and guarding offenders and

interdicting contraband and MDOC could not eliminate the screenings without impairing the

corrections officers’ ability to complete their work. Dispensing with the activity, they say,

would result in the introduction of weapons or other contraband into the facility and make it

impossible for the corrections officers to safely and effectively maintain custody and

discipline of inmates. The corrections officers, however, fail to cite to any facts in the Rule

74.04 record supporting these assertions. There are no facts to show what impact, if any,

eliminating security screenings would have on the corrections officers’ work.

 The Rule 74.04 record establishes only that submitting to a search upon entry, like all

preshift activities, is “important to the end of housing dangerous criminals” and “connected

to keeping criminals safely locked behind bars.” These two facts, alone, do not demonstrate

submitting to a search when entering the facility is a compensable principal activity.

 The United States Court of Appeals, Tenth Circuit, reached the opposite conclusion in

Aguilar v. Management & Training Corp., 948 F.3d 1270 (10th Cir. 2020). It found

submitting to a correctional facility’s security procedures was integral and indispensable to

the officers’ principal activities of maintaining custody and discipline of inmates and

providing security, in part, because the screenings and the principal activities shared the same

goals of providing prison security. Id. at 1278-79. This is a subtle expansion of the test

formulated in Busk, and Aguilar cites no authority for the proposition that an activity may be

 23
integral if it shares a common goal with the work. In fact, Aguilar is the only case this Court

has found that uses such a test. This Court is not bound to follow Aguilar’s interpretation of

the Portal-to-Portal Act, see Wimberly v. Lab. & Indus. Rels. Comm’n of Mo., 688 S.W.2d

344, 347 (Mo. banc 1985), and doing so would likely result in the very issue the

Portal-to-Portal Act was passed to address – unexpected liabilities due to an overly broad

definition of compensable work.

 Accordingly, the corrections officers failed to establish sufficient undisputed facts

entitling them to a determination, as a matter of law, that the security screenings are

indispensable and integral to their work. The portion of the circuit court’s judgment finding

liability on this issue was not supported by the Rule 74.04 record.

 3. Receiving Assignments

 The circuit court also found the corrections officers were entitled to be compensated

for time spent receiving assignments from a supervisor. MDOC claims the circuit court erred

in so finding because a handful of cases have held the activity is not compensable. Those

cases are not persuasive; it makes no difference that, in other circumstances, an activity is not

compensable. Due to the focus on an activity’s relation to an employee’s work, per se

holdings that a certain activity is not compensable are impossible. The corrections officers

do not offer an argument specific to the preshift activity of receiving assignments.

 The Rule 74.04 record discloses only that some corrections officers must report to a

supervisor for assignment and that, like all preshift activities, doing so is important for and

connected to housing offenders. The Rule 74.04 record is devoid of facts that could be found

to demonstrate obtaining a work assignment is integral to supervising, guarding, escorting, or

 24
disciplining offenders. On this record, the corrections officers have failed to show time spent

reporting to a supervisor for assignment is compensable, as a matter of law.

 4. Picking Up and Returning Equipment

 Some corrections officers must retrieve equipment such as keys and radios from

electronic key boxes or “issue rooms.” 9 MDOC claims the circuit court erred in finding this

activity was compensable because picking up equipment is a quintessential preliminary

activity. It asserts the Portal-to-Portal Act was enacted to override cases like Anderson that

had held time spent “putting on aprons and overalls, removing shirts, taping or greasing arms,

putting on finger cots, [and] preparing the equipment for productive work” was compensable.

To bolster its claim, MDOC cites several cases that hold donning and doffing or picking up

ordinary safety equipment is not compensable.

 The corrections officers emphasize that, in MDOC’s Rule 74.04(c) response, it

admitted “having radios and the ability to communicate for relief in shift is integral” to the

corrections officers’ work, and corrections officers are “fully equipped” the entire time they

are within the security envelope. They also cite to Aguilar, which held a similar activity in

the context of the work of corrections officers could not be eliminated without impairing the

corrections officers’ ability to do the work. 948 F.3d at 1280. They assert radios and keys

are closely connected to their work and argue it “seems obvious that an officer could not

effectively complete [his or her] essential functions” without checking out the equipment

needed to supervise, guard, escort, and discipline an offender.

9
 Not all corrections officers need to collect radios or keys. Some are issued their own radios
or receive them at their posts.
 25
 In regard to this activity, the Rule 74.04 record shows corrections officers “pick up

their keys and equipment immediately before or immediately after going through the airlock

and are fully equipped the entire time they are within the security envelope” and “having

radios and the ability to communicate for relief is integral to the corrections officers’ work.”

Additionally, like all preshift and postshift activities, picking up and returning radios and keys

is “important to the end of housing dangerous criminals” and “connected to keeping criminals

safely locked behind bars.” These facts, especially the fact corrections officers use radios to

communicate for relief while on shift, demonstrate retrieving radios and keys is integral to

the corrections officers’ work. The work is, in part, using radios to communicate. Therefore,

the undisputed material facts demonstrate the time spent picking up and returning equipment

used in supervising, guarding, escorting, and disciplining offenders on shift is a principal

activity. The Rule 74.04 record established as a matter of law, that MDOC is liable to

compensate them for this activity.

 5. Time Spent Supervising Offenders

 After passing through security, receiving assignments, passing through the airlock (if

applicable), and retrieving keys and radios, corrections officers walk to their posts. The Rule

74.04 record shows that, during this time, corrections officers are, as a job requirement: “on

duty and expected to respond” to incidents involving offenders; required to act as prison

guards whenever they are inside the prisons; and required to remain vigilant and respond to

incidents as they arise.

 MDOC claims the requirement that corrections officers remain vigilant and intervene

in emergent incidents involving offenders while performing preshift and postshift activities

 26
does not transform the time spent on the activities into compensable time. For support, it cites

cases dealing with a wide swath of security-related professions that found time spent merely

being required to remain alert and respond or to be “on call” is not compensable time.

 The corrections officers’ assertion they are entitled, as a matter of law, to a

determination that this time is compensable is demonstrated by several facts MDOC admitted

in their Rule 74.04(c) response:

 • they are “on duty and expected to respond” when walking to and from their posts;
 • they are expected to act as prison guards whenever they are inside the prisons;
 • as a job requirement, they are required to remain vigilant and respond to fights and
 other incidents, even when not on post;
 • MDOC trains corrections officers to be careful during preshift and postshift activities
 and shift change times;
 • incidents have occurred between corrections officers and offenders where offenders
 confronted staff, before their shift or leaving their post after their shift; and
 • MDOC compensates them for time spent responding to incidents while off-shift.

 The corrections officers are employed to supervise, guard, escort, and discipline

offenders. The Rule 74.04 record shows that, although the corrections officers are not at their

posts, they are required to do the work they are employed to do – specifically, supervising

offenders and, when the need arises, intervening in fights or responding to other incidents

(i.e., guarding and disciplining offenders). This is the same work expected of the corrections

officers during their shifts. The only difference is where within the facility they do the work,

at or away from their posts. Because the corrections officers are supervising, guarding, and

disciplining offenders during this time, once they are in the presence of inmates and “on duty

and expected to respond” to emergent incidents, they are performing the work they are

employed to do.

 27
 MDOC seeks to avoid this conclusion by asserting the time spent actually responding

to an incident is compensable (and, indeed, the corrections officers are paid for time spent

responding) but time spent remaining vigilant or merely supervising offenders is not

compensable. It draws a distinction between actually responding to or intervening in fights

and other incidents on the one hand and the preceding activity of supervising and monitoring

offenders on the other. But this distinction is immaterial. An important part of the work the

corrections officers are employed to do is supervising, guarding, and disciplining offenders.

It is true the need to respond to an incident may not arise on a daily basis, but the work of

supervising offenders is, in and of itself, part of the corrections officers’ work.

 Corrections officers are required to perform essentially the same duties during preshift

and postshift time as they are required to perform when on shift. Whether done at or away

from their posts, supervising and monitoring offenders and intervening when necessary is the

work MDOC employs them to do. While merely walking to and from their posts, alone, has

not been shown to be compensable, time they are “on duty and expected to respond,” which

includes time spent walking to and from their posts, is compensable. 10

10
 The Rule 74.04 record shows corrections officers supervise offenders and respond to fights
and other incidents, at the latest, when walking to and from their posts. There is some
indication they may supervise offenders and respond to emergent incidents at other times. For
example, they are expected to “act as prison guards” at all times. But the record is insufficient
to show at what other times, if any, corrections officers supervise and respond while away
from their posts. The time spent supervising, guarding, and disciplining offenders happens to
coincide with the time spent walking to and from posts, but the compensability of time spent
supervising offenders is not dependent on the activity of walking to and from posts.
 28
 6. Exchange of Information

 The final preshift activity and first postshift activity expected of the corrections officers

is to communicate information between incoming and outgoing shifts. Other than listing the

passing of pertinent information from one shift to the next as a preshift and postshift activity

and describing preshift activities, generally, as important to and connected with the end of

housing offenders, the Rule 74.04 record contains no facts related to this activity. It cannot

be determined whether this activity refers to individual officers communicating information

to the officers relieving them or to a main officer briefing the next shift as a whole. It is also

impossible to determine whether this exchange of information occurs at their posts or at some

central location. This absence of facts on the issue precludes any determination that the

activity is indispensable or integral to the work or that it occurs after the corrections officers

pick up radios and keys or are deemed to be on duty and expected to respond to emergent

incidents, i.e., within the continuous workday.

 7. Patrol Vehicle Inventory

 Some of the corrections officers work as vehicle patrol officers. One of the vehicle

patrol officers’ preshift activities is to inventory their vehicles’ weapons, ammunition, and

equipment. Other than identifying this as a required activity, the corrections officers have not

supplied facts relating to the purpose or impact of this activity. The undisputed facts do not

show whether the vehicle patrol officers could dispense with this activity without impairing

their ability to do their jobs or whether it is an intrinsic element of supervising, guarding,

escorting, or disciplining offenders. On this record, the facts are insufficient to demonstrate

the vehicle inventory is a compensable principal activity.

 29
 The corrections officers established only two of their preshift and postshift activities

are integral and indispensable to the work they are employed to do, as required by the

Portal-to-Portal Act. The circuit court’s grant of partial summary judgment on Counts III and

VI is affirmed insofar as it holds time spent picking up and returning equipment and time they

are “on duty and expected to respond” when not on shift is compensable. Because the

corrections officers’ statement of uncontroverted material facts did not present facts sufficient

to decide whether the other activities are compensable, either because they qualify as principal

activities or because they occur after the first and before the last principal activity, the circuit

court erred in holding all preshift and postshift activities are compensable, as a matter of law.

 D. Proof of Compensability on Remand

 Because the compensability of preshift and postshift activities was decided on

summary judgment, the Court is not finding on the merits that those activities that were not

shown to be compensable affirmatively are not compensable. The corrections officers have

merely failed to establish undisputed material facts that demonstrated all of their preshift and

postshift activities are compensable. Having failed to meet their burden on summary

judgment, whether the labor agreements require MDOC to compensate the corrections

officers for time spent performing preshift and postshift activities other than picking up and

returning equipment and supervising offenders while not on shift remains unadjudicated and

subject to further proof on remand. If the remaining activities are indispensable and integral

to the corrections officers’ work or if they occur after the first and before the last principal

activity, they are compensable. After the circuit court determines which activities are

compensable, damages must be recomputed accordingly.

 30
 E. Declaratory and Injunctive Relief Improper

 MDOC next claims the circuit court erred in granting declaratory and injunctive relief

on Count VII of the Officers’ petition. The circuit court’s amended judgment found,

regarding Count VII, that the parties’ labor agreements required MDOC to pay for time spent

performing all preshift and postshift activities, as required by the FLSA. Believing the time

spent on preshift and postshift activities qualified as compensable worktime, the circuit court

also declared MDOC in violation of its contractual duty to track all time worked. It then

ordered MDOC to compensate the corrections officers for their preshift and postshift activities

prospectively and implement a timekeeping system to record time spent on preshift and

postshift activities.

 For the reasons discussed above, the corrections officers failed to show all their preshift

and postshift activities qualify as compensable principal activities. Consequently, the circuit

court’s judgment on Count VII, which was premised on its determination that all preshift and

postshift activities were compensable, cannot stand. On this record, the circuit court erred in

holding the FLSA required compensation for the time spent performing all such activities and

in granting the corrections officers declaratory and injunctive relief on Count VII.

 Vacating the award of damages further eliminates any alleged prejudice from the

circuit court’s exclusion of MDOC’s expert witnesses on the issue of damages during the

jury trial. Therefore, this claim of error need not be addressed.

 III. Conclusion

 The corrections officers can maintain a private breach of contract cause of action

against MDOC, and the circuit court did not err in refusing to decertify the class. The circuit

 31
court did err, however, when it determined pursuant to Rule 74.04(c) all the corrections

officers’ preshift and postshift activities are compensable principal activities that must be

compensated under the terms of the labor agreements incorporating the FLSA. Insofar as the

circuit court’s judgment determined time spent picking up radios and keys and time they are

on duty and expected to respond to emergent incidents is compensable, the circuit court’s

judgment is affirmed. In all other respects, including the award of damages, the circuit court’s

judgment is vacated. Because the circuit court’s grant of declaratory and injunctive relief was

based on its erroneous finding that all preshift and postshift activities qualify as compensable

principal activities, it further erred in granting declaratory and injunctive relief. The circuit

court’s judgment is affirmed in part and vacated in part, and the cause is remanded.

 ___________________________________
 PATRICIA BRECKENRIDGE, JUDGE

Draper, C.J., Wilson, Russell,
Powell and Fischer, JJ., concur.

 32